1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOLENE HARTJE,

               Plaintiff,

     v.

JO ANNE B. BARNHART, Commissioner of
Social Security,

               Defendant.

CASE NO.    C03-5681RBL

REPORT AND
RECOMMENDATION

Noted for April 1, 2005

Plaintiff, Jolene Hartje, has brought this matter for judicial review of the denial of her applications for disability insurance and supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Honorable Ronald B. Leighton's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born on July 31, 1960. Tr. 61. She has a high school education and past work experience as a certified nurse's aide and developmental assistant. Tr. 103, 118.

On April 26, 1999, plaintiff filed applications for disability insurance and SSI benefits, alleging

disability as of April 15, 1997, due to fibromyalgia. Tr. 23.  Both applications were denied initially and on reconsideration. Tr. 22.  A hearing was held on January 19, 2000, before an administrative law judge ("ALJ"). Id.  At the hearing, plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Id.  On February 28, 1998, the ALJ issued a decision finding plaintiff not disabled, because she was capable of performing other jobs existing in significant numbers in the national economy. Tr. 26-28.

Plaintiff filed another application for disability insurance benefits on June 29, 2001, again alleging disability as of April 15, 1997, due to fibromyalgia with symptoms of pain, fatigue, depression, balance problems, migraines, urinary and bowel problems, and memory difficulties. Tr. 11, 61, 64, 71, 112.  Her application was denied initially. Tr. 30.  No reconsideration of that denial was required. Tr. 10.  Plaintiff requested a hearing, which was held before a different ALJ, on May 20, 2002. Tr. 184.  At the hearing, plaintiff, represented by counsel, appeared and testified, as did her husband. Tr. 184-211.

On August 27, 2002, the second ALJ declined to re-open the prior ALJ's decision, and determined plaintiff to be not disabled, finding specifically in relevant part as follows:

    (1)    at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity since February 25, 2000;

    (2)    at step two, plaintiff had a "severe" impairment consisting of fibromyalgia;

    (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

    (4)    at step four, plaintiff had the residual functional capacity to perform the full range of sedentary work, but was unable to perform her past relevant work; and

    (5)    at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 11, 17-18.  Plaintiff's request for review was denied by Appeals Council on October 3, 2003, making the second ALJ's decision the Commissioner's final decision. Tr. 2-3. 20 C.F.R. §§ 404.981, 416.1481.

On December 5, 2003, plaintiff filed a complaint with this court seeking judicial review of the second ALJ's decision. (Dkt. #4).  Plaintiff argues that decision should be reversed and remanded for an award of benefits for the following reasons:

    (a)    the ALJ erred in evaluating the medical evidence in the record;

    (b)    the ALJ erred in assessing plaintiff's credibility;

    (c)    the ALJ erred in discounting the testimony of plaintiff's husband;

(d)    the ALJ erred in finding plaintiff capable of performing sedentary work; and

(e)    the ALJ erred in relying on the Medical-Vocational Guidelines (the "Grids") to find plaintiff disabled at step five of the disability evaluation process.

For the reasons set forth below, the undersigned recommends the second ALJ's decision be affirmed.

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.    The ALJ Properly Evaluated the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, therefore, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001); Magallanes, 881 F.2d at 75. An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A nonexamining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

After providing a detailed chronological summary of the medical evidence in the record (Tr. 11-14), the ALJ made the following findings:

> This chronology shows that examinations failed to show signs indicative of the claimant's allegations such as significant muscle weakness and muscle atrophy. Examinations failed to reveal that the claimant had significant weight loss indicative of her allegations. No examiner observed during an examination that the claimant had significant limitations in her social functioning, concentration, persistence, and pace indicative of the claimant's allegations. The claimant several times reported improvement with treatment, and there is no objective medical evidence in the record that the claimant had side effects from medications as severe as alleged. The undersigned notes that based on the objective medical evidence in the record the claimant at best went to the emergency room twice in 2000 after February 24, 2000 (Exhibit F, pp. 1-14), and otherwise sought no other treatment during that period. . . .

> The undersigned finds that the claimant has fibromyalgia, which is more than a slight abnormality that more than minimally affects her ability to perform basic work activities. The claimant, therefore, has a severe impairment. The claimant does not have balance problems, migraines, and urinary and bowel problems that significantly affect her ability to perform work-related activities for 12 months or longer. The claimant reported that her headaches resolved with medication (Exhibit F, p. 39). It was noted that her diarrhea resolved with treatment (Exhibit F, pp. 57-58). The objective medical evidence fails to show that she had a medically determinable impairment that would be expected

to result in balance problems and fails to show that she sought treatment for balance problems indicative of the severity alleged.

The claimant was diagnosed with and treated for anxiety and depression. Dr. [Sherry E.] Shuman essentially opined that the claimant was disabled due in part to anxiety. However, the claimant testified that she used to be depressed but that she was no longer because her doctor helped her understand her condition. No examination revealed that she had limitations in her daily activities, social functioning, concentration, persistence, and pace as severe as alleged. There is no objective medical evidence in the record she sought treatment from a mental health professional and that she required psychiatric hospitalization. Dr. Shuman's own treatment records fails [sic] to reveal that the claimant had symptoms of anxiety as frequent and as severe as she suggested in her May 21, 2002 letter. No other physician noted the claimant had signs and symptoms of anxiety as severe as Dr. Shuman suggested. . . .

Dr. Shuman essentially opined that the claimant was disabled. The undersigned gives the opinion neither controlling weight nor much deference because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with the other substantial medical evidence in the case record (SSR 96-2p). Dr. Shuman's own treatment records fail to show that the claimant had signs indicative of Dr. Shuman's opinion such as muscle atrophy. Her records fail to show that the claimant lost significant weight indicative of her opinion.

Tr. 14-16. Plaintiff first argues the ALJ erred in stating that objective medical evidence in the record did not support the degree of severity of symptoms she was found to have by Dr. Shuman, one of her treating physicians. The undersigned disagrees.

      A.     Dr. Shuman's Diagnostic Notes and Treatment Records

     As stated by the ALJ, Dr. Shuman's opinion is not well-supported by her own diagnostic notes and treatment records. Thomas, 278 F.3d at 957 (ALJ need not accept opinion of treating physician that is brief, conclusory, and inadequately supported by clinical findings). In August 2001, plaintiff told Dr. Shuman that she had had "[l]ess pain" and "more exercise" during a three month trip to California. Tr. 134. While Dr. Shuman noted a number of trigger points and diagnosed plaintiff with fibromyalgia, she found "[n]o palpable nodes." Id.

     On November 26, 2001, although plaintiff indicated she previously had been depressed and was "now better," Dr. Shuman diagnosed her with depression/anxiety. Tr. 128-29. On examination, plaintiff was alert and in no distress. Tr. 129. She was fully oriented, and her mood and affect were normal. Id. Dr. Shuman also diagnosed plaintiff with fibromyalgia and diarrhea. Id. Plaintiff's physical examination, however, was unremarkable. Her cardiovascular and respiratory systems were normal, as were her neck, back, skin and bowels. Id. Plaintiff's extremities were non-tender, with full range of motion and no pedal edema, clubbing or cyanosis. Id. She had a normal gait and neurological examination, with no motor or

1  sensory deficit. Id.

2       Just nine days later, Dr. Shuman filled out and submitted a "Fibromyalgia Residual Functional

3  Capacity Questionaire" form. Tr. 161.  She stated that plaintiff met the American Rheumatological criteria

4  for fibromyalgia, that her prognosis was "poor," and that her impairments had lasted or could be expected

5  to last for at least 12 months. Id.  She also stated that plaintiff's symptoms included multiple tender points,

6  non-restorative sleep, chronic fatigue, frequent and severe headaches, numbness and tingling, anxiety, and

7  depression. Id.  She further stated that plaintiff experienced pain severe enough to interfere with attention

8  and concentration "constantly," and that the degree to which plaintiff was limited in her ability to deal with

9  work stress was severe. Tr. 162.

10       The questionaire Dr. Shuman filled out also contained a number of questions concerning the nature

11  and extent of plaintiff's estimated physical functional limitations in a competitive work situation.  Those

12  questions, for example, requested information regarding the following:

13       (1)     How many city blocks plaintiff could walk without rest or severe pain;

14       (2)     How many hours and/or minutes she could continuously sit and stand at one
15                 time;

16       (3)     How long she could sit and stand/walk total in an 8-hour workday;

17       (4)     Whether she needed to include periods of walking during an 8-hour workday;
18       (5)     Whether she sometimes needed to take unscheduled breaks during an 8-hour
               workday;

19       (6)     How many pounds she could lift and carry; and

20       (7)     Whether she had significant limitations in doing repetitive reaching, handling or
21                 fingering

22  Tr. 163-64.  With respect to each of these questions, Dr. Shuman wrote "not tested." Id.  In addition, she

23  stated that plaintiff did not need to elevate her legs during prolonged sitting, and did not require use of an

24  assistive device while engaged in occasional standing and/or walking. Id.  Finally, she did not provide any

25  answer regarding the following questions:

26       (a)     Whether plaintiff needed a job that permitted shifting positions at will from
               sitting, standing or walking;

27       (b)     What percentage of time during an 8-hour workday she would be able to bend
               and twist at the waist; and

28       (c)     Whether her impairments were likely to produce "good days" and "bad days,"

that could result in her being absent from work.

Tr. 164.

Dr. Shuman's examination of plaintiff in February 2002, furthermore, was again basically normal. Tr. 126. In particular, Dr. Shuman found plaintiff's weight loss issue had resolved. Id. However, in a May 2002 letter to plaintiff's attorney, Dr. Shuman opined in relevant part as follows:

> Jolene Harjie has a history of fibromyalgia. She has severe anxiety disorder as well. Each time she is anxious, she loses weight and as her anxiety improves and control, her weight loss resolves. She has recurrent nausea, vomiting, and irritable bowel with diarrhea associated with her anxiety. She has diffuse pain. She has headaches on a daily basis . . . She in fact has all of the fibromyalgia trigger points and has throughout her course. Her functional capacity is very poor. As a result of her severe pain, she naps frequently. She is too anxious to perform any activity for any length of time and also has too much pain to even do basic housework and [activities of daily living].

Tr. 122. Thus, although Dr. Shuman stated that plaintiff had significant functional restrictions due to her fibromyalgia in December 2001, the examination she performed just prior thereto did not indicate plaintiff had any such restrictions, and the questionaire she filled out at that time did not provide any information regarding plaintiff's work-related physical limitations. In addition, while Dr. Shuman opined in May 2002, that plaintiff could not perform any activity for any length of time, including basic activities of daily living, the examination she performed in February 2002, again revealed no such limitations.

B.    The Other Objective Medical Evidence in the Record

The other objective medical evidence in the record also supports the ALJ's findings. In November 2000, plaintiff visited the hospital complaining of having had a headache for the past four days. Tr. 170. Her examination, however, was basically normal. Tr. 175. She was alert, fully oriented and in no apparent distress. Id. Her neurological, sensorimotor, cardiovascular, respiratory, and musculoskeletal systems were all intact. Id. She was discharged in stable and improved condition. Id. Although plaintiff again presented with having had a week-long headache, for which she stated "nothing helps" in mid-February 2001, again, except for some tenderness, her examination was normal. Tr. 178, 181. Plaintiff was noted to have "drug seeking behavior," and was discharged in stable condition. Tr. 181.

In late February 2001, plaintiff reported to Dr. Christina Lenk, her treating neurologist, that she had occasional visual problems "not necessarily associated" with headaches, and that she had had "episodes of a weak feeling in her left hand" and an associated "heavy feeling in the entire left arm." Tr. 147. She also reported a decline in her balance and "a tendency to fall to the left." Id. Plaintiff further reported, however,

1  that an MRI she had in 1996 was normal. Id.  Dr. Lenk's physical examination of plaintiff also was normal,

2  and plaintiff reported no pain or tenderness in her trapezius or other muscles. Tr. 148.

3       In terms of her neurological examination, plaintiff was alert, appropriate and attentive, her speech

4  was fluent, and her comprehension was intact. Id.  Other findings were entirely within the normal range as

5  well. Id.  Specifically, her sensation, motor and extremity strength, muscle tone and bulk, coordination, and

6  gait were all intact. Id.  Due to plaintiff's complaints of "left-sided incoordination and weakness," Dr. Lenk

7  recommended obtaining a brain MRI to look for evidence of vascular disease and possible stroke. Id.  Dr.

8  Lenk suspected, however, that the MRI likely would not show any abnormalities because her examination

9  was normal. Id.  Indeed, such testing came back negative. Tr. 146, 149-50.

10      In early March 2001, plaintiff reported being "[o]verall, somewhat better" and being able to sleep

11  better, although she still apparently had "continuous diarrhea." Tr. 146.  In September 2001, she reported

12  that while she continued to have headaches, they were not frequent, developing primarily when she was

13  nervous or anxious. Tr. 145.  She further noted that nasal spray "typically" caused "complete resolution" of

14  her pain within one to two hours. Id.  Thus, she felt her headaches, which she previously had been having

15  on a daily basis, had improved. Id.  In addition, the one time her nasal spray did not work, she was given a

16  prescription for Valium, which she reported "completely resolved that headache" and improved her neck

17  and back pain. Id.  Dr. Lenk recommended she follow-up with him in three months. Id.

18      In early October 2001, plaintiff told Dr. Raymond Leung that the pain medications and muscle

19  relaxants she was taking did "help somewhat," and that she was on Trazodone to help her sleep. Tr. 165.

20  Plaintiff also specifically noted "no psychiatric problems." Id.  While she stated that she had "occasional

21  difficulty" with bending and squatting, and difficulties with prolonged sitting and standing due to pain,

22  plaintiff also stated that she could walk 3 blocks before needing to stop and could climb up one flight of

23  stairs at a time. Id.  Although plaintiff did not know how much she could lift maximally, she reported that

24  she did not use any assistive ambulatory devices. Id.

25      Dr. Leung diagnosed plaintiff with fibromyalgia. Tr. 167.  However, her physical examination was

26  "[w]ithin normal limits," and she was in no apparent distress. Tr. 166.  Her affect also was within normal

27  limits, her energy level appeared adequate, and "[s]he even laughed on occasion." Tr. 167.  Plaintiff could

28  heel and toe walk, squat, and flex forward to ninety degrees without tenderness or spasms. Tr. 167.  Her

1   gait was normal, and she did not have any difficulty getting on and off of the examination table. Id.  Her

2   grip strength was good, her fine finger movement was intact, she had no muscle atrophy, and her motor

3   strength was essentially intact. Id.  While plaintiff was diffusely tender to palpation, Dr. Leung could find

4   "no significant difference between trigger points and non-trigger points." Tr. 167.  Plaintiff's neurologic

5   examination was normal as well, as were her extremities. Id.

6        A physical residual functional capacity assessment form was completed in late October 2001, by a

7   non-examining consulting physician.  Plaintiff was deemed capable of lifting and/or carrying 20 pounds

8   occasionally and 10 pounds frequently, standing and/or walking about 6 hours in an 8-hour workday, and

9   sitting about 6 hours in an 8-hour workday. Tr. 76.  She was found to be unlimited in her ability to push

10  and/or pull, to be able to balance frequently, and to be able to climb ramps and stairs, stoop, kneel, crouch,

11  and crawl occasionally. Tr. 76-77.  She was deemed to be only mildly limited in her ability to finger (fine

12  manipulation), but she could not climb ladders, ropes or scaffolds. Tr. 77-78.   Although she was found to

13  be credible in terms of her allegation of diffuse pain, her statement of being unable to work was considered

14  to be only partially so. Tr. 80- 81.

15       In December 2001, Dr. Lenk noted that plaintiff was "doing better," with fewer and less severe

16  headaches that resolved completely with valium. Tr. 144.  In February 2002, plaintiff saw Dr. James Taylor

17  for a chief complaint of diarrhea, which she described as being "moderate." Tr. 154.  On examination, she

18  was in only "mild" distress, due to "minimal body fat." Id.  Otherwise, her examination was essentially

19  normal, with no sensory, motor or other deficit, although she did have moderate diffuse tenderness in her

20  abdomen. Id.  On discharge, plaintiff was told to perform "[a]ctivities as tolerated," to not drive or operate

21  machinery while taking sedatives, and to be off work for one day. Tr. 155.  Thus, as can be seen from the

22  above discussion of the medical evidence in the record, no other physician found the kind of significant

23  limitations that Dr. Shuman opined plaintiff had.

24       C.    Plaintiff's Other Arguments

25       Plaintiff also argues the ALJ erred in evaluating the medical evidence in the record by: (1) implying

26  that he did not believe in cases where the primary diagnosis is fibromyalgia; (2) stating that there was no

27  objective medical evidence in the record that plaintiff sought treatment from a mental health professional or

28  required psychiatric hospitalization; and (3) stating that Dr. Shuman's records failed to show plaintiff had

1   any muscle atrophy or significant weight loss.

2        As to plaintiff's first argument, the ALJ may not reject a diagnoses of fibromyalgia solely on the

3   basis that it is not supported by objective medical evidence. See Benecke v. Barnhart, 379 F.3d 587, 594

4   (9th Cir. 2004) (ALJ erred in discounting opinions of treating physicians by relying on his own disbelief of

5   claimant's symptom testimony and misunderstanding of fibromyalgia).  It is thus improper to "effectively"

6   require "'objective' evidence for a disease that eludes such measurement." Id. (citing Green-Younger v.

7   Barnhart, 335 F.3d 99, 108 (2nd Cir. 2003)).

8        Plaintiff points to a comment the ALJ made in the hearing that fibromyalgia symptoms "are easy to

9   fake." Tr. 203.  This comment, she asserts, suggests the ALJ did not believe in cases where the primary

10  diagnosis was fibromyalgia.  In his decision, however, the ALJ did find that plaintiff had fibromyalgia, and

11  that it was a "severe" impairment. Tr. 15, 17.  Thus, this is not a case where the ALJ found there was no

12  objective medical evidence that plaintiff had fibromyalgia.  Rather, as discussed above, he properly found

13  that the objective medical evidence in the record failed to indicate plaintiff had any significant limitations

14  because of that, or any other, condition. See Thomas, 278 F.3d at 957 (ALJ not required to accept treating

15  physician opinion that is inadequately supported by clinical findings).

16       In addition, it is true that evidence of having sought professional mental health treatment or having

17  required psychiatric hospitalization are not in themselves necessary to establish the existence of a mental

18  impairment.  As discussed above, however, the ALJ also found that the objective medical evidence in the

19  record, including Dr. Shuman's own diagnostic notes and treatment records, failed to show that plaintiff had

20  any significant mental impairments, or limitations therefrom. See Id.

21       Finally, the undersigned agrees that it was not proper for the ALJ to reject Dr. Shuman's opinion

22  because her records failed to show plaintiff had muscle atrophy or significant weight loss, as there is no

23  indication in the record that such findings are expected to result from a diagnose of fibromyalgia. See

24  Gonzalez Perez v. Secretary of Health and Human Services, 812 F.2d 747, 749 (1st Cir. 1987) (ALJ may

25  not substitute own layman's opinion for findings and opinion of physician; see also McBrayer v. Secretary

26  of Health and Human Services, 712 F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute his own

27  judgment for competent medical opinion). As discussed above, however, the other reasons the ALJ gave for

28  rejecting Dr. Shuman's opinion were proper, and the weight of the medical evidence in the record

REPORT AND RECOMMENDATION
Page - 10

1  supported the ALJ's findings in that regard.

2  II.      The ALJ Properly Assessed Plaintiff's Credibility

3          Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d

4  639, 642 (9th Cir. 1982). The court should not "second-guess" this credibility determination. Allen, 749

5  F.2d at 580. In addition, the court may not reverse a credibility determination where that determination is

6  based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a

7  claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

8  as that determination is supported by substantial evidence. Tonapetyan, 242 F.3d at 1148.

9          To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

10 disbelief." Lester, 81 F.3d at 834 (citation omitted). The ALJ "must identify what testimony is not credible

11 and what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834; Dodrill v. Shalala, 12

12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's

13 reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The

14 evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th

15 Cir. 2003).

16         In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

17 evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

18 testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ

19 also may consider a claimant's work record and observations of physicians and other third parties regarding

20 the nature, onset, duration, and frequency of symptoms. Id.

21         The ALJ discounted plaintiff's credibility in part because of "[t]he absence of objective medical

22 evidence to support the degree of severity of subjective complaints alleged." Tr. 14. A finding that a

23 claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing

24 requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998). Plaintiff argues

25 the ALJ erred in so finding, because Dr. Shuman prescribed medication for plaintiff and a competent and

26 ethical physician would not do so without good reason. While Dr. Shuman may have prescribed plaintiff

27 medication in good faith, as discussed above, both her diagnostic and treatment records, and the weight of

28 the other objective medical evidence in the record, show that plaintiff's physical and mental impairments did

REPORT AND RECOMMENDATION
Page - 11

1   not result in any significant, let alone disabling, limitations.

2         The ALJ also discounted plaintiff's credibility in part because one medical source noted she had

3   "drug-seeking behavior." Tr. 14, 180.  Plaintiff argues that the fact that she went to the emergency room

4   complaining of extreme pain, and asked for and was prescribed pain medication by a physician, does not

5   mean that she lacks credibility simply because that physician made a note about drug seeking behavior.  It is

6   the ALJ's responsibility, however, to resolve ambiguities and conflicts in the evidence. Reddick, 157 F.3d at

7   722; Sample, 694 F.2d at 642.  The court thus may not reverse the ALJ's credibility determination where it

8   is based on contradictory or ambiguous evidence. Allen, 749 F.2d at 579.  As such, the ALJ did not err in

9   considering the evaluating physician's note as evidence that plaintiff was less than fully credible. See Edlund

10   v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001) (ALJ properly considered claimant's drug-seeking

11   behavior).

12         Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a

13   finding that a proffered reason is not believable, also "can cast doubt on the sincerity of the claimant's pain

14   testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  If the claimant provides evidence of a good

15   reason for not taking medication, however, her symptom testimony cannot be rejected because she failed to

16   do so. Smolen, 80 F.3d at 1284.  As discussed above, the ALJ found there was no objective evidence in the

17   record that plaintiff sought treatment from a mental health professional or that she ever required psychiatric

18   hospitalization, even though she alleged disability due to depression.  While such lack of evidence may be

19   insufficient for finding that plaintiff does not have a mental impairment, it is a proper basis for discounting

20   her credibility regarding her allegations of disabling symptoms.

21         The ALJ also discounted plaintiff's credibility in part because her "daily activities were inconsistent

22   with her allegations" of disabling symptoms. Tr. 14.  Specifically, the ALJ noted that she went for walks,

23   took care of pets, went on trips, and reported spending her day doing housework. Id.  To determine

24   whether plaintiff's symptom testimony is credible, the ALJ may consider her daily activities. Smolen, 80

25   F.3d at 1284.  Such testimony may be rejected if she "is able to spend a substantial part of her day

26   performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7.

27   Plaintiff need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home

28   activities may not be easily transferable to a work environment." Id.

Plaintiff argues the ALJ erred in considering her activities of daily living, by ignoring evidence in the record that she was taken care of by her husband and that she received assistance from others with her household chores and self-care.  The undersigned disagrees.  Although plaintiff's husband testified that he assisted plaintiff in her daily activities (Tr. 207-08), as discussed below, the ALJ properly discredited that testimony to the extent he stated he did so because of her alleged impairments.  In addition, while plaintiff testified that she required assistance from others with her self-care and activities of daily living (Tr. 201), she reported that she spent her day doing housework such as the laundry, vacuuming and mopping (albeit with rest after each task), and that she walked for exercise (Tr. 92).

Dr. Shuman did state in May 2002, that plaintiff was in too much pain to do basic housework and other activities of daily living. Tr. 122.  In August 2001, however, she noted that during a three-month trip to California, plaintiff was able to do "more exercise." Tr. 134.  In October 2001, plaintiff reported being able to walk three blocks at a time. Tr. 165.  In February 2002, Dr. Taylor instructed her to continue to do "[a]ctivities as tolerated," and that she should only be off work for one day. Tr. 155.  Thus, the ALJ did not err in discounting plaintiff's testimony for this reason as well.  Even if the evidence in the record regarding plaintiff's ability to perform her activities of daily living can be said to be conflicting or ambiguous, again it is the ALJ's responsibility to resolve those conflicts and ambiguities. Reddick, 157 F.3d at 722; Sample, 694 F.2d at 642; Allen, 749 F.2d at 579 (court may not reverse ALJ's credibility determination where it is based on contradictory or ambiguous evidence).  He properly did so here.

Lastly, plaintiff argues the ALJ erred in discounting her credibility because Dr. Shuman noted that she used cannabis, and because of the amount of work-related earnings she had in the years since 1989. Tr. 14, 125.  The undersigned agrees that the use of cannabis on one occasion and plaintiff's earnings record alone do not establish a lack of credibility.  The mere fact that some of the ALJ's reasons for discrediting plaintiff's testimony are not legitimate, however, does not render his credibility determination invalid, as long as it is supported by the substantial evidence, as it is here. Tonapetyan, 242 F.3d at 1148.

III.   The ALJ's Did Not Err in Discounting the Testimony of Plaintiff's Husband

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay

1  testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

2  1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting

3  lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for

4  dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those

5  reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may

6  "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

7         Plaintiff argues the ALJ erred in discrediting the testimony of plaintiff's husband, because it was

8  consistent with Dr. Shuman's opinion regarding the limitations plaintiff had in her ability to function on a

9  daily basis.  The undersigned disagrees.  The ALJ discredited the testimony of plaintiff's husband for the

10  following reasons:

11         The undersigned notes that the claimant's witness testified that he took care of the
           claimant, drove her where she needed to go, and did the cooking, shopping, and laundry.
12         The undersigned finds that the witness is credible about what he did for the claimant, but
           does not find persuasive the suggestion that he did these activities due to the claimant's
13         impairment in view of the paucity of medical documentation and the whole evidentiary
           record.  Furthermore, the undersigned notes that the claimant stated in one form that she
14         spent the day doing household chores such as doing the laundry (Exhibit E, pp. 20-21).

15  Tr. 15.  As discussed above, the ALJ did not err in discrediting Dr. Shuman's opinion, properly finding the

16  objective medical evidence in the record did not support that opinion.  Thus, the ALJ properly discredited

17  the testimony of plaintiff's husband for that reason as well.

18  IV.    The ALJ Properly Found Plaintiff Capable of Performing Sedentary Work

19         If a disability determination "cannot be made on the basis of medical factors alone," the ALJ must

20  identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for

21  work-related activities." SSR 96-8p.  A claimant's residual functional capacity assessment is used at step

22  five of the disability evaluation process to determine whether he or she can do other work, "considering his

23  or her age, education, and work experience." Id. at *2.  In other words, it is what the claimant "can still do

24  despite his or her limitations." Id.

25         A claimant's residual functional capacity is the maximum amount of work the claimant is able to

26  perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

27  must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

28  limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

The ALJ assessed plaintiff with the following residual functional capacity:

> [T]he claimant has the maximum residual functional capacity to lift and carry no more than 10 pounds. The claimant can sit for up to six hours in an eight-hour workday, and can stand and/or walk for up to two hours each in an eight-hour workday. This residual functional capacity reflects an ability to perform the full range of sedentary work.

Tr. 16. Plaintiff argues the ALJ failed to consider the non-exertional limitations that Dr. Shuman found she had, such as severe pain, the need to nap frequently, bouts of anxiety, recurrent nausea, vomiting, and irritable bowel. Again, however, because the ALJ properly discounted Dr. Shuman's opinion, he did not err in excluding those limitations from plaintiff's residual functional capacity assessment.

V.    The ALJ Properly Relied on the Grids in Finding Plaintiff Capable of Performing Other Jobs Existing in Significant Numbers in the National Economy

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000). The Grids may be used if they "*completely and accurately* represent a claimant's limitations." Tackett, 180 F.3d at 1101 (emphasis in the original). That is, the claimant "must be able to perform the *full range* of jobs in a given category." Id. (emphasis in the original). If the claimant "has significant non-exertional impairments," however, reliance on the Grids is not appropriate. Ostenbrock, 240 F.3d at 1162; Tackett, 180 F.3d at 1102 (non-exertional impairment, if sufficiently severe, may limit claimant's functional capacity in ways not contemplated by Grids).

At step five of the disability evaluation process, the ALJ found in relevant part as follows

> The facts in this case coincide exactly with the criteria of Rule 201.28 in Table No. 1 of the Medical-Vocational Guidelines in Appendix 2, Subpart P, Regulations No. 4 (Guidelines), which directs a finding of "not disabled" when the claimant's vocational factors and a residual functional capacity for the full range of sedentary work are considered. These Guidelines take administrative notice that the functional capacity for a full or wide range of sedentary work represents a substantial work capacity compatible with making a work adjustment to substantial numbers of unskilled jobs . . . Noting Rule 201.28, the undersigned finds that there are jobs that exist in significant numbers in

the national economy that the claimant can perform when her age, education, work experience, and residual functional capacity are considered.

Tr. 17.  Plaintiff argues the ALJ erred in relying on the Grids, again because the ALJ failed to consider the non-exertional limitations Dr. Shuman found.  As discussed above, however, the ALJ properly discredited Dr. Shuman's opinion.  Because no other medical source in the record found plaintiff had the kind of non-exertional limitations found by Dr. Shuman, furthermore, the ALJ did not err in determining her capable of performing the full range of sedentary work.  Therefore, because the medical evidence in the record did not support a finding of "significant" non-exertional limitations, the ALJ also did not err in relying on the Grids to find plaintiff not disabled.  Nor, for the same reason, was the ALJ required to obtain the testimony of a vocational expert.

<u>CONCLUSION</u>

Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was not disabled, and should affirm the ALJ's decision.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto.  <u>See also</u> Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **April 1, 2005**, as noted in the caption.

DATED this 7th day of March, 2005.


/s/ Karen L. Strombom
Karen L. Strombom
United States Magistrate Judge